STATE FARM LLOYDS, Appellant,

v.

PERFORMANCE IMPROVEMENT COR-
PORATION; and L.X., Individually and
as Next Friend of Jane, A Minor, Appel-
lees.

No. 04–96–00499–CV.

Court of Appeals of Texas,
San Antonio.

March 25, 1998.

Rehearing Overruled May 15, 1998.

J. Hampton Skelton, Catherine L. Hanna, Scott K. Arnold, Skelton & Woody, Austin, for appellant.

Thomas C. Hall, Law Office of Tom Hall, P.C., Daniel A. Bass, San Antonio, for appellees.

Before HARDBERGER, C.J., and RICKHOFF and JOHN G. HILL,[1] JJ.

## OPINION

JOHN G. HILL, Justice (Assigned).

State Farm Lloyds appeals from a judgment rendered against it in the amount of $2 million, plus interest and attorney's fees. This was initially a declaratory judgment action with respect to a question of insurance coverage in an underlying matter relating to child molestation. State Farm contends in four points of error that the trial court erred in denying State Farm's Motion for Judg-

ment N.O.V. because, as a matter of law, (1) an underlying judgment against Performance Improvement Corporation, State Farm's insured, was collusive, invalid, and unenforceable against State Farm; (2) Performance's failure to cooperate in its defense precludes any recovery against State Farm; (3) the claims against Performance were excluded from coverage as professional services; and (4) there was not an occurrence, or, at most, there was only one occurrence under the relevant insurance policy. State Farm also urges, alternatively, that the answer to jury questions numbers one and two are against the great weight and preponderance of the evidence.

We reverse and render judgment that the appellees take nothing because the claims against Performance were excluded from coverage as professional services.

Performance was sued by the mother of a young child who alleged damages based upon allegations that the child had been molested, on more than one occasion, by a maintenance employee who had been screened and tested by Performance on behalf of the apartment complex where the child lived. Performance carried its business liability insurance at the time with State Farm.

State Farm urges in point of error number three that the trial court erred in denying its motion for judgment n.o.v. because, as a matter of law, the claims made against Performance were excluded from coverage as "professional services," or, alternatively, that the jury's answer to Question 1 was against the great weight and preponderance of the evidence.

"Upon motion and reasonable notice, a trial court may render judgment notwithstanding the verdict if a directed verdict would have been proper." *City of San Benito v. Cantu,* 831 S.W.2d 416, 422 (Tex.App.—Corpus Christi 1992, no writ). A "Plaintiff is entitled to an instructed verdict if (a) plaintiff has ... so conclusively supported every fact proposition constituting a component element of at least one theory of recovery that reasonable persons could not differ as to the conclusion that each such proposition is true;

1. Assigned to this case by the Chief Justice of the  Supreme Court of Texas.

and (b) the defendant has failed to support some affirmative defense either by proving conclusively, or by offering evidence sufficient to raise a reasonable doubt as to, the truth of each fact proposition constituting a component element of such affirmative defense." 4 McDONALD TEXAS CIVIL PRACTICE § 21:52 (1992).

In response to a question as to whether the damages assessed against Performance in the underlying lawsuit were assessed due to the rendering or failure to render any professional service with respect to management consulting, the jury answered "no."

■ State Farm had insured Performance with a Texas Commercial Package policy. The policy provided that it did not apply to " 'bodily injury,' 'property damage,' 'personal injury,' or 'advertising injury' due to the rendering or failure to render any professional service." The policy lists "management consultant" as the excluded professional service.

In the underlying lawsuit, the plaintiff's Fifth Amended Original Petition alleged several causes of action against Performance. One alleged a DTPA violation relating to Performance taking advantage of the plaintiffs' lack of capacity to know the wholly inadequate procedure taken by Sumar, the landlord, and Performance to screen the apartment's employees. The petition also alleged that Performance was negligent in failing to check the criminal histories of prospective employees and in failing to administer a test more capable of revealing deviant or criminal tendencies or personality traits with respect to prospective employees, and that it engaged in a conspiracy to commit negligence by agreeing to facilitate the inadequate screening of prospective employees and by using a test that it knew or should have known was wholly inadequate to perform the screening task. Finally, the petition alleged that the test sold by Performance was a defective and unreasonably dangerous product.

At the trial of the underlying lawsuit, there was no testimony presented that the test administered by Performance, the Wilkerson Audit, was in any way defective or unreasonably dangerous, nor was any argument made to that effect. Testimony that was presented related to the arrangement Performance had with Sumar, the management company, and how the employment screening was conducted. There was also testimony as to what had happened to the plaintiff and on the issue of damages.

We hold that these undisputed facts establish as a matter of law that the liability of Performance in the underlying lawsuit was solely based upon its performance of professional services, management consulting, not on the sale of a product. This is true even if, as suggested by Performance, it was primarily involved in the sale of a product. Consequently, the trial court erred by overruling State Farm Lloyd's Motion For Judgment N.O.V.

Performance contends that the professional services definition is ambiguous. It relies upon the case of *Aetna Fire Underwriters Ins. Co. v. Southwestern Eng'g Co.*, 626 S.W.2d 99 (Tex.App.—Beaumont 1981, writ ref'd n.r.e.). We find that case to be distinguishable. In *Aetna*, the insurance policy in question had an exclusion for engineering services. The act giving rise to liability was negligence in locating pipelines. The Court held that the mere locating of pipelines did not fall within the engineering services exclusion because it could not determine as a matter of law that "the physical act of digging for and locating underground pipelines requires engineering education, training, and experience in the application of special knowledge of the mathematical, physical, or engineering sciences so as to constitute the practice of professional engineering." *Id.* at 101. It then said, "The least that can be said is that the term 'engineering services,' not being definitely defined in the contract, is an ambiguous term." *Id.*

We interpret the Court's decision as saying that if the term "engineering services" included services that did not require engineering education, training and experience so as to constitute the practice of professional engineering then it must be an ambiguous term. Under the facts of this case, the only asserted basis for any liability of Performance was negligence or DTPA liability

based upon the performance of professional services, including consultation with management, not upon the sale of a product.

Performance relies upon several out-of-state cases in which it says the phrase "professional services" was held to be ambiguous. These cases include *Pacific Indem. Co. v. Linn,* 766 F.2d 754 (3rd Cir.1985); *Dailey v. Transitron Overseas Corp.,* 349 F.Supp. 797 (S.D.Tex.1972); *Essex Ins. Co. v. Williams St. Ctr.,* 863 F.Supp. 1373 (D.C.Colo.1994), *rev'd,* 52 F.3d 894 (10th Cir.1995); *Atlantic Mut. Ins. Co. v. Acker,* 1993 WL 536133 (E.D.Pa.1993); *American Motorists Ins. Co. v. Republic Ins. Co.,* 830 P.2d 785 (Alaska 1992); *First Newton Nat'l Bank v. General Casualty Co. of Wis.,* 426 N.W.2d 618 (Iowa 1988); *Shaw v. Fidelity & Casualty Ins. Co.,* 582 So.2d 919 (La.Ct.App.1991); *McCarthy v. Berman,* 656 So.2d 717 (La.Ct.App.1995), *rev'd,* 668 So.2d 721 (La.1996); *Camp Dresser & McKee, Inc. v. The Home Ins. Co.,* 30 Mass.App.Ct. 318, 568 N.E.2d 631 (1991); *Williams v. Herrera,* 83 N.M. 680, 496 P.2d 740 (1972); *Duke Univ. v. St. Paul Fire and Marine Ins. Co.,* 96 N.C.App. 635, 386 S.E.2d 762 (1990); *Cannon v. First Nat'l Bank of East Islip,* 98 A.D.2d 704, 469 N.Y.S.2d 101 (1983); *Shapiro v. Aetna Insurance Company,* 26 Misc.2d 820, 208 N.Y.S.2d 83 (1960); *Kuzmier v. New Amsterdam Casualty Co.,* 155 N.Y.S.2d 301 (1956); and *Biborosch v. Transamerica Ins. Co.,* 412 Pa.Super. 505, 603 A.2d 1050 (1992).

We have examined all of these cases and find that as a group they do not serve as authority for any suggestion that the "professional services" exclusion is always ambiguous. To the extent any one of those cases holds that the exclusion is always ambiguous, we respectfully decline to adopt such a holding.

We have also examined a case that is the closest factually to our case. That case is *Search EDP v. American Home Assurance Co.,* 267 N.J.Super. 537, 632 A.2d 286 (1993). In that case, which involved pre-employment screening services, the Court held that the professional services exclusion was unambiguous. *Id.* at 289. Having reviewed these cases, we conclude that whether the term is ambiguous or not is not governed by an all-encompassing rule, but by an examination of the circumstances of each individual case. As the Court did in *Search,* we hold that in this case the exclusion is unambiguous.

Performance refers us to the testimony of Neal Johnston, who testified at the declaratory judgment trial that he had never acted as a management consultant to Sumar. The evidence is undisputed, however, that Performance, through Johnston, administered the test in question to Sumar's prospective employees and asked them additional questions concerning their criminal history, their workers' compensation history, and their prior employment history. Additionally, it is undisputed that Johnson expressed to management the results in comparable terms as between several employees seeking the same job. Again, we hold that under these facts the term "professional services" is unambiguous and that Performance, through Johnston, was acting as a management consultant as a matter of law. We sustain point of error number three.

In view of our determination of this point of error, it is not necessary that we determine the remaining points of error.

We reverse and render judgment that the appellees take nothing as to State Farm.

Dissenting opinion by HARDBERGER, C.J.

HARDBERGER, Chief Justice, dissenting.

I respectfully dissent to my brethren's opinion and would defer to the jury's verdict on the issue that was properly submitted to it. The following sentence from the majority's opinion contains the heart of its holding: "We hold that these undisputed facts establish as a matter of law that the liability of Performance in the underlying lawsuit was solely based upon its performance of professional services, management consulting, not on the sale of a product." I agree that there are facts to support this conclusion; however I disagree that those facts are "undisputed." If the jury had reached a different conclusion, I would affirm; however, I submit that the term "management consultant" as contained in the professional services exclusion was ambiguous, and that there were disputed

facts with respect to whether the services undertaken by Performance were professional management consulting services. I read the testimony as containing each parties' good faith assertions regarding their understanding of the policy and its coverage. However, I believe the policy leaves room for confusion and misunderstanding regarding its coverage because of the ambiguity of the term "management consultant."

The policy clearly excludes any liability arising out of "management consultant" work undertaken by Performance to the extent that work constitutes a "professional service." However, "management consultant" is never defined in the policy. State Farm Lloyds argues that "management consultant" should be accorded the "plain, ordinary meaning of 'management consultant.'" I do not believe there is a "plain, ordinary meaning." Listing "management consultant" as an excluded professional service in the policy does not clarify as a matter of law what is being excluded, and the facts presented at trial with respect to its meaning are clearly not "undisputed." Johnston, the president of Performance, gave a description to the insurance company of some of the things Performance did. What Johnston said though was not made a part of the policy. Furthermore, it was State Farm Lloyds belief that Johnston was describing services that met the definition of "professional services" so as to be excluded from coverage. Certainly, Johnston did not request that State Farm Lloyds construe his services to be professional services so that they would be excluded from coverage.

Johnston's description of the services Performance provided is evidence of his understanding of "management consultant" services, but Johnston testified that he did not believe that the service provided in this case was included in the definition of the term "management consultant." State Farm Lloyds believes that it is. Both sides presented testimony to support their view of the language used.

Of course, the parties' varying interpretation of the contract does not make the contract ambiguous. *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995).

If so, every time there was a dispute over a contract there would be an ambiguity. However, in this case, the lack of definition of the duties included in the term "management consultant" leads to a circular interpretation of what is covered and what is excluded. Consider the following testimony of Sue Noll, the claims superintendent for State Farm Lloyds:

Q. And can we fairly understand, Ms. Noll, that the first thing that this policy does, it excludes professional services.

A. Yes, sir.

Q. Can you testify before this jury that if the services that are the subject of the exclusion are not professional, that they are not excluded by this exclusion?

A. Services Mr. Johnston would perform? Is that what you're asking me? I'm not sure. Could you say it again? I'm sorry.

Q. Well, you have in your mind an idea of what the definition of professional services is; correct?

A. Yes, sir.

Q. And so if the services that are the subject of a dispute are not professional services, would you agree they are not excluded under this exclusion?

A. Yes, sir, I gave you some examples. If Mr. Johnston dropped a VCR or if he knocked over an easel or if the carpet was possibly torn or buckled, those are operations that—that are part of his operations that would have been covered.

Q. And would you further agree with me that not all professional services are excluded from this policy? Only professional services that involve management consultant are excluded?

A. That's the description, yes, sir; management consultant. And we felt he was advising management at Sumar.

Q. I understand your position in that regard. But will you agree that there are—in order to fit under this exclusion, the services had to be profession-

al and they had to be management consultant both?

A. Management consultant was his professional services. Yes, sir.

Q. So you're saying there's one test. I'm asking you, will you agree that there are two?

A. I don't see two. I don't understand what you're saying two.

Q. Okay. But you're in agreement to say that the only thing that's excluded is professional services of a management consultant.

A. Yes, sir, that's correct.

If the duties of a management consultant can be given a certain legal meaning and it can be determined that such services constitute professional services as a matter of law, then the jury's services were not needed. However, in order to reach those decisions as a matter of law in this case, we are required to hold that "management consultant" has a clear legal meaning despite the disputed facts that presented two interpretations regarding its meaning. Furthermore, we would be required to hold that a pre-employment test is not only a service performed by a "management consultant" but that such a service is a "professional service," which the trial court defined as follows:

"[P]rofessional services" means services involving labor, skill, education and special knowledge. The labor and skill involved are predominantly mental or intellectual rather than physical or manual. It is the essence of professional services that the compensation or profit is dependent mainly upon the personal qualifications of the person by whom it is carried on.

I cannot reach such a holding from the record presented.

If the professional service was "aircraft pilot," I would agree that the professional duties included in that service are unambiguous. Aircraft pilots use their labor, education and special knowledge to fly airplanes. Likewise, I would agree that the professional duties included in professional "medical services" are unambiguous and would include the treatment of injured and diseased people which requires labor, skill, education and

special knowledge. But a "management consultant" is a much softer term, and it means different things to different people. Furthermore, reasonable minds could differ as to which duties performed by a management consultant are professional services, requiring labor, skill, education and special knowledge. In my opinion, it is this later disagreement that was the basis for the Beaumont court's holding in *Aetna Fire Underwriters Ins. Co. v. Southwestern Engineering Co.*, 626 S.W.2d 99, 101 (Tex.App.—Beaumont 1981, writ ref'd n.r.e.). The Beaumont court was unable to agree that the service at issue required "engineering education, training and experience in the application of special knowledge of the mathematical, physical, or engineering sciences, so as to constitute the practice of professional engineering." *Id.* Therefore, the court's inability to find a "professional" component to the service at issue was the basis for its opinion. *See id.*

I recognize State Farm Lloyds position that if you couple certain statements of Johnston with the words used in the policy, there is no ambiguity because Johnston has defined the duties of a management consultant with his statements. However, the policy does not contain Johnston's statements, and if we need to consider his statements to understand what the policy excludes, then by definition, there is an ambiguity. And this ambiguity encompasses both the question of what duties are performed by a management consultant and the question of which of those duties are professional services.

The jury was asked the following:

Do you find that damages were assessed against Performance in the underlying lawsuit due to the rendering or failure to render any professional service with respect to management consulting.

The jury was provided a definition of "professional services." The jury, having been correctly charged and instructed, found that Performance's damages were not due to the "render[ing][of] any professional service with respect to management consulting." Because the evidence was disputed as to whether the service at issue in this case was included in the definition of management consultant and, if so, whether the service

was a professional service, I would follow the jury's verdict, hold the exclusion did not apply, and affirm the trial court's judgment.